David H. Bundy (AK Bar 7210043)
DAVID H. BUNDY, P.C.
310 K Street, Suite 200
Anchorage, Alaska  99501
Telephone:  (907) 248-8431
Facsimile:  (907) 248-8434

Timothy A. ("Tad") Davidson II *(admitted pro hac vice)*
David A. Zdunkewicz *(admitted pro hac vice)*
Joseph P. Rovira *(admitted pro hac vice)*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile:  (713) 220-4285

Proposed Attorneys for the Debtors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Cook Inlet Energy, LLC | § | Case No. 15-00236 |
| Miller Energy Resources, Inc.; | § | Case No. _____ |
| Miller Energy Services, LLC; | § | Case No. _____ |
| Miller Energy GP, LLC; | § | Case No. _____ |
| Miller Rig & Equipment, LLC; | § | Case No. _____ |
| Miller Drilling, TN LLC; | § | Case No. _____ |
| East Tennessee Consultants, Inc.; | § | Case No. _____ |
| East Tennessee Consultants II, L.L.C.; | § | Case No. _____ |
| Anchor Point Energy, LLC; | § | Case No. _____ |
| Savant Alaska, LLC; and | § | Case No. _____ |
| Nutaaq Operating LLC.[1] | § | Case No. _____ |
| | § | |
| Debtors. | § | Joint Administration Requested |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Cook Inlet Energy, LLC, an Alaska limited liability company (6643); Miller Energy Resources, Inc., a Tennessee corporation (8629); Miller Drilling, TN LLC, a Tennessee limited liability company (8891); Miller Energy Services, LLC, a Delaware limited liability company (8670); Miller Energy GP, LLC, a Delaware limited liability company (0999); Miller Rig & Equipment, LLC, a Delaware limited liability company (8727); East Tennessee Consultants, Inc., a Tennessee corporation (3108); East Tennessee Consultants II, L.L.C., a Tennessee limited liability company (0107); Anchor Point Energy, LLC, an Alaskan limited liability company (7946); Savant Alaska, LLC, a Colorado limited liability company (0579); and Nutaaq Operating LLC, an Alaska limited liability company (2908).

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF
MILLER ENERGY RESOURCES, INC., *ET AL.*, IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Carl F. Giesler, Jr., hereby declare:

1.      I am the Chief Executive Officer of Miller Energy Resources, Inc. ("MER"), one
of the above-captioned debtors and debtors in possession (collectively, "Miller" or the "Debtors"
or the "Company").   In this capacity, I am familiar with Miller's day-to-day operations,
businesses, capital structure, organization, financial affairs, legal and regulatory matters and
books and records.

2.      On the date hereof (the "Petition Date"), MER and ten of its subsidiaries each
filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the
"Bankruptcy Code").[2]   The entities continue to operate their businesses and manage their
properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy
Code.  Concurrently herewith, Miller filed a motion seeking joint administration of these chapter
11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the
"Bankruptcy Rules").

3.      On August 6, 2015, three of  Cook Inlet Energy, LLC's alleged creditors (the
"Petitioning Creditors") filed an involuntary bankruptcy petition (the "Involuntary Petition")
against Cook Inlet Energy, LLC ("CIE") in the United States Bankruptcy Court for the District
of Alaska (the "Court").   On September 8, 2015, CIE and the Petitioning Creditors submitted a
Joint Stipulation to the Court extending the deadline for CIE to answer the Involuntary Petition
to October 6, 2015.  On September 9, 2015, the Court entered an order setting October 6, 2015 as

---

[2] Cook Inlet Energy, Inc. consented to the Involuntary Petition filed against it by the Petitioning Creditors.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*,
IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

HOU:3593019.6

the deadline to respond to the Involuntary Petition.  On October 1, 2015, CIE filed a Consent to

Order for Relief (the "Consent") consenting to entry of an order for relief under chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code").

4.    I submit this declaration (this "First Day Declaration") to provide an overview of

these chapter 11 cases and to support Miller's chapter 11 petitions and "first day" motions (each,

a "First Day Motion," and collectively, the "First Day Motions").  Except as otherwise indicated

herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of

Miller's operations and finances, information learned from my review of relevant documents,

information supplied to me by other members of Miller's management team and advisors, or my

opinion based on my experience, knowledge, and information concerning Miller's operations

and financial condition.  I am authorized to submit this First Day Declaration on behalf of Miller,

and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.    To familiarize the Court with Miller and the relief it will seek on the first day of

these chapter 11 cases, this First Day Declaration is organized as follows:  Part I describes

Miller's corporate history, business operations, and prepetition organizational and capital

structure.  Part II describes the events leading to the commencement of these chapter 11 cases.

Finally, Part III sets forth the relevant facts in support of each First Day Motion.

I.    **Miller's Corporate History and Assets, Business Operations, and Organizational
and Prepetition Capital Structure.**

A.    **Corporate History and Assets**

6.    Miller is an independent oil and natural gas exploration and production company

focused on developing oil and gas properties in the state of Alaska.  Founded in 1967, Miller has

progressed from a private Appalachian-focused contract driller to a publicly-traded, Alaska pure-

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*,
IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

3

HOU:3593019.6

play exploration and production company.  MER went public through a reverse-merger with a public shell company in 1997.  In December 2009, Miller acquired the Alaskan operations of Pacific Energy.  Miller has continued strategically to acquire assets, most recently acquiring Savant Aalska, LLC and its North Slope operations in December 2014.  In November 2014, Miller divested substantially all of its Appalachia assets to focus its efforts on its Alaska operations.

7.      Miller now has substantial acreage, reserves and resource position and significant midstream and rig infrastructure in Alaska.  Primarily through CIE, a wholly-owned subsidiary of MER, Miller operates in multiple production basins in Alaska with proven, producing fields, state-of-the-art infrastructure, and 100% working interest in and operatorship of most of its acreage.

8.      Miller's assets are concentrated in southcentral Alaska, including the Cook Inlet and Kenai Peninsula, as well as the Badami area of the North Slope.  The Company owns meaningful infrastructure in Alaska, including significant storage and processing facilities, the Osprey offshore production platform, numerous oil and gas pipelines and four drilling rigs. Miller operates primarily in four distinct fields in Alaska: (i) Redoubt Unit; (ii) West McArthur River Unit (WMRU) (includes Sword field and Sabre prospect); (iii) North Fork Unit; and (iv) Badami (Savant) Unit.  In addition to these fields, Miller has approximately 466,285 acres of leases and exploration licenses for future development.  Miller's total acreage is approximately 530,704 gross acres

9.      Currently, CIE owns a 100% working interest in 29 wells in Alaska and MER owns a 100% working interest in 10 wells in Tennessee.  Additionally, CIE owns a 30% working

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

4

HOU:3593019.6

interest in 2 wells in Alaska and Savant Alaska, LLC owns a 67.5% working interest in 8 producing wells and 2 injection wells in Alaska.

10.     Below are maps showing the Cook Inlet and location of the various units in which Miller has oil and gas production operations:





**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

5

HOU:3593019.6

11.   <u>Redoubt Unit.</u>  The Redoubt Unit is an oil field in a large four-way structure on the west side of the Cook Inlet.  Miller holds a 100% operating and working interest and an 83.6% net revenue interest in its wells and produced an average of approximately 970 working interest boepd in August 2015.  The Osprey Platform is an exploration and production platform which produces oil and gas from Redoubt Shoals Field, and is connected to Miller's Kustatan Production Facility. It relies on Miller's Kustatan Production Facility and Miller's West McArthur River Unit Production Facility to provide all of its electricity and gas, and on the Kustatan Production Facility to process all of Osprey's produced fluids.  A picture of the Osprey Platform is below.



12.   Below are maps of the Redoubt Unit.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

HOU:3593019.6







**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

HOU:3593019.6

13.     The Kustatan Production Facility is located onshore on the west side of the Cook Inlet and can process approximately 25,000 barrels of oil per day ("bopd"), with the ability to expand to 50,000 bopd.  A picture of the Kustatan Facility is below.



14.     <u>West McArthur River Unit (WMRU).</u>  The WMRU is also located in the Cook Inlet, approximately six miles north of the Redoubt Unit.  Miller holds a 100% operating and working interest and a 77.7% net revenue interest in its wells and produced an average of approximately 1,270 working interest boepd in August 2015.   Miller also owns the West McArthur Production Facility, which processes oil and gas from the West McArthur River Field and has the ability to process gas from the West Foreland field.  It has approximately 12,800 barrels of oil storage capacity and 25,600 barrels of fluid processing capacity. Below is a map of WMRU.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

8

HOU:3593019.6



15. <u>North Fork Unit</u>.   The North Fork Unit is located on the southern Kenai Peninsula, east of the community of Anchor Point.   The North Fork Unit consists of 8 natural gas wells and related leases consisting of approximately 11,382 net acres.   Miller holds an 80.4% net revenue interest in the field and produced an average of approximately 1,460 working interest boepd in August 2015.   Anchor Point Energy, LLC (one of the Debtors), owns and operates 7.4

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

9

HOU:3593019.6

miles of twin 4-inch natural gas transmission pipelines which service the North Folk Unit.

Below is a map of the North Fork Unit:



**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

10

HOU:3593019.6

16. <u>Badami Unit.</u> The Badami Unit is an approximately 17,000 acre field east of Prudhoe Bay on Alaska's North Slope which Miller acquired through the acquisition of Savant Alaska, LLC in December 2014.  The facilities include a 12-inch oil pipeline and 6-inch gas pipeline, both running 25 miles in length from Badami Unit to the Endicott Pipeline (the "Badami Pipeline"); however, the Badami Pipeline is owned by Nutaaq Pipeline, LLC, which is not a Debtor, and the Badami Pipeline is subject to a $1 purchase option held by BP Transportation (Alaska), Inc., which expires December 31, 2016.  Other midstream assets acquired included a modular oil and gas production facility with 38,500 bopd design capacity, a 500,000 gallon diesel storage tank, a grind and inject solid waste disposal facility, one mile airstrip, and 20MW of power generation.  Miller also acquired 100% working interest in nearby leases.  Miller operates and holds a 67.5% working interest and 57.7% net revenue interest in the Badami Unit and produced an average of approximately 590 working interest boepd in August 2015.  A picture of the Badami Production Facility and a map of the Badami Unit are below:

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

11

HOU:3593019.6





**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.***,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

HOU:3593019.6

**B.** **Alaska Tax Credits**

17.     Miller is the beneficiary of several tax incentive programs from the state of Alaska.  Alaska provides state cash tax rebate credits (the "Tax Credits") designed to de-risk the drilling process by providing incentives for developers to find new resources and to develop existing resources in undeveloped or underdeveloped locations, such as the Cook Inlet.  Through its cash Tax Credits program, the State of Alaska has historically reimbursed Miller in cash for approximately 35%-65% of its drilling and completion costs and carried-forward annual loss credits in the Cook Inlet area.  Significantly, the credits are paid regardless of well success. Miller applies for the drilling and completion costs credits quarterly and the carried-forward loss credits annually.

18.     As of August 2015, Miller was owed approximately $27 million from the State of Alaska in Tax Credits.  In late August, 2015, the State of Alaska made a partial payment in the amount of $6.4 million to CIE.  This partial payment was used to fund certain safety and compliance obligations associated with the wells and to pay down the outstanding balance owed to KeyBank.  Miller has been in discussions with the State of Alaska concerning the payment of the remaining approximately $21 million in Tax Credits owed and anticipates that the remaining balance will be paid shortly after filing of these bankruptcies.

**C.** **Business Operations.**

19.     Miller is an independent exploration and production company engaged in the acquisition, exploration, production, development and exploitation of crude oil and natural gas properties.  Miller's principal executive offices (where the CEO and CFO reside) are located in Houston, Texas, with operational offices in Alaska, and an administrative office Tennessee.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.*,
**IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

HOU:3593019.6

Miller has approximately 95 employees between its various offices and locations, the majority of which work in Alaska.

**D.    Miller's Organizational Structure.**

20.    The following chart depicts Miller's organizational structure:



21.    <u>Miller Energy Resources, Inc</u>.  MER is a publicly traded holding company and is the ultimate parent company.    Along with approximately 10 oil and gas wells in Tennessee and fee title to the land on which they are located, MER owns an office building and storage yard in Scott County, Tennessee, an aircraft, several vehicles and various other pieces of equipment including the four drilling rigs.  MER has an office lease from the Pellissippi Pointe entities (discussed below) and it owns real property in Scott County, Tennessee, and an office building in Huntsville, Tennessee.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

22.     <u>Miller Drilling, TN LLC</u>.  Miller Drilling, TN LLC is a Tennessee limited liability company wholly-owned by MER.  It owns various pieces of equipment that had been used in Miller's discontinued Tennessee drilling operations.  It previously served as operator for Miller's Tennessee oil and gas operations prior to Miller's divestiture of substantially all of its Tennessee assets in November 2014.  It operates the approximately 10 remaining wells in Tennessee.  It has no employees.

23.     <u>Miller Energy Services, LLC.</u>  Miller Energy Services, LLC is a Delaware limited liability company wholly-owned by MER.  It has no assets, no operations and no employees.   It previously provided drilling services for Miller and third-parties in Tennessee prior to Miller's divestiture of substantially all of its Tennessee oil and gas operations in 2014.

24.     <u>Miller Energy GP, LLC.</u>  Miller Energy GP, LLC is a Delaware limited liability company wholly-owned by MER.  In April 2009, MER formed Miller Energy Income 2009-A, LP ("MEI").  MEI was organized to provide the capital required to invest in various types of oil and gas ventures including the acquisition of oil and gas leases, royalty interests, overriding royalty interests, working interests, mineral interests, real estate, producing and non-producing wells, reserves, oil and gas related equipment including transportation lines and potential investments in entities that invest in such assets (except for other investment partnerships sponsored by affiliates of MEI).  The limited partnership interests in MEI were redeemed and paid out in full in February 2014 and, pursuant to Delaware law, it legally ceased to exist 90 days after it ceased to have any limited partners.  Miller Energy GP, LLC was the general partner of MEI.  Neither Miller Energy GP, LLC nor MEI have any remaining assets, operations or employees.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.***,
IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

15

HOU:3593019.6

25.     <u>Miller Rig & Equipment, LLC.</u>  Miller Rig & Equipment, LLC is a Delaware limited liability company wholly-owned by MER.  It no longer has any assets, operations, or employees.  It previously owned and operated drilling equipment which was ultimately sold to MER.

26.     <u>Cook Inlet Energy, LLC.</u>  CIE is an Alaska limited liability company wholly-owned by MER.  It owns the oil and gas leases and licenses in Alaska and oversees Miller's operations in Alaska.  It also owns equipment used in Miller's drilling activities, including certain platforms and pipelines.  As not above, CIE is subject to an involuntary petition filed in the Court.

27.     <u>East Tennessee Consultants, Inc.</u>  East Tennessee Consultants, Inc. is a Tennessee corporation wholly-owned by MER.  It owns equipment used in Miller's operations, including certain vehicles, as well as approximately 1 acre in Scott County, Tennessee where a compressor sits.  Previously, it owned and operated oil and gas assets in Tennessee prior to Miller's divestiture of substantially all of its Tennessee oil and gas operations in 2014.

28.     <u>East Tennessee Consultants II, L.L.C.</u>  East Tennessee Consultants II, L.L.C. is a Tennessee limited liability company wholly-owned by MER.  It owns an office building in Morgan County, Tennessee.  It has no operations, assets or employees.  Previously, it owned and operated oil and gas assets in Tennessee prior to Miller's divestiture of substantially all of its Tennessee oil and gas operations in 2014.

29.     <u>Anchor Point Energy, LLC.</u>  Anchor Point Energy, LLC is an Alaska limited liability company wholly-owned by Cook Inlet Energy, LLC. Anchor Point Energy, LLC, owns

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.***,
IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

16

HOU:3593019.6

and operates 7.4 miles of twin 4-inch natural gas transmission pipeline associated with the North Fork Unit.

30.     <u>Savant Alaska, LLC.</u>  Savant Alaska, LLC is a Colorado limited liability company wholly-owned by Miller.  It owns various pieces of equipment used in Miller's operations  It also owns a 67.5% working interest in and operates the Company's Badami Unit and the Badami Pipeline (via sub-contract).

31.     <u>Nutaaq Operating LLC.</u>  Nutaaq Operating, LLC is an Alaska limited liability company wholly-owned by Savant Alaska, LLC, which is wholly-owned by MER.  It owns various pieces of equipment used in Miller's operations.

32.     <u>Nutaaq Pipeline, LLC.</u>  Nutaaq Pipeline, LLC. is an Alaska limited liability company wholly-owned by Savant Alaska, LLC, which is wholly-owned by MER.  It holds title to, but does not operate, the Badami Pipeline used in Miller's operations.  As noted herein, the Badami Pipeline is subject to a $1 purchase option in favor of BP Transportation (Alaska), Inc., and BP Transportation (Alaska), Inc. is also required to exercise such option on the request of Savant Alaska, LLC.   Nutaaq Pipeline, LLC is not a Debtor.

33.     <u>Pellissippi Pointe, LLC.</u>  Pellissippi Pointe, LLC is a Tennessee limited liability company in which Miller owns 48% membership interest.  Pellissippi Pointe, LLC owns an office building located at 9725 Cogdill Road, Knoxville, TN 37932.  Pellissippi Pointe, LLC is not a Debtor.

34.     <u>Pellissippi Pointe II, LLC.</u> Pellissippi Pointe II, LLC is a Tennessee limited liability company associated with Pellissippi Pointe, LLC in which Miller owns 48% membership interest.   As noted above, Pellissippi Pointe II, LLC owns the office building

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.***,
IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

located at 9721 Cogdill Road, Knoxville, TN 37932, where Miller's Tennessee offices are located.  Pellissippi Pointe II, LLC is not a Debtor.

### E. Miller's Capital Structure

#### 1. First Lien Revolver

35.     On June 2, 2014, Miller entered into the First Lien Loan Agreement, among Miller, as borrower, KeyBank as Administrative Agent ("KeyBank"), and certain lender parties thereto (the "RBL Lenders" and together with KeyBank, the "First Lien Lenders") (as subsequently amended or supplemented, the "First Lien Loan Agreement").  The First Lien Loan Agreement provides a senior secured, reserve-based revolving credit facility of up to $250,000,000 (the "First Lien RBL").

36.     In conjunction with the First Lien Loan Agreement, certain of the Debtors entered into the Guarantee and Collateral Agreement in favor of the First Lien Lenders (as subsequently amended, the "KeyBank Guarantee Agreement") whereby such Debtors guaranteed the amounts owed under the First Lien Loan Agreement.  Additionally, each of the Debtors granted to KeyBank a first lien security interest in substantially all of their respective assets.

37.     In September 2015, Miller paid off the final amounts owed under the First Lien Loan Agreement and terminated the commitment.  The claims of the First Lien Lenders have been satisfied in full.  As a result, the Second Lien Lenders are now the senior priority secured creditors of Miller.

#### 2. Second Lien Credit Agreement

38.     On February 3, 2014, the Company refinanced its $100,000,000 credit facility with Apollo Investment Corp. ("Apollo") by entering into a new Credit Agreement (as amended,

DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

18

HOU:3593019.6

the "Second Lien Credit Agreement") between Miller, as borrower, Apollo, as administrative agent, and certain affiliates of Highbridge Capital Strategies, as lenders (the "Second Lien Lenders" and together with the First Lien Lenders, the "Prepetition Lenders")[3], which set forth the terms of a credit facility of $175,000,000 (as amended, the "Second Lien Credit Facility"). The Second Lien Credit Agreement provided for a $175,000,000 term credit facility, all of which was made available to and drawn by Miller on the closing date.

39.     In conjunction with the Second Lien Credit Agreement, certain of the Debtors entered into the Guarantee and Collateral Agreement in favor of the Second Lien Lenders (as subsequently amended, the "Apollo Guarantee Agreement") whereby such Debtors guaranteed the amounts owed under the Second Lien Credit Agreement and granted a security interest in substantially all of their assets.  Through subsequent amendments to the Second Lien Credit Agreement and Apollo Guarantee Agreement, each of the Debtors are now guarantors of the amounts owed under the Second Lien Credit Agreement and each of the Debtors have granted the Second Lien Lenders a lien on substantially all of their assets.

40.     As of the date hereof, the Debtors owe approximately $190 million under the Second Lien Credit Agreement comprised of $183.8 million in principal and prepetition interest and an approximately $5.9 million make-whole payment pursuant to the Second Lien Credit Agreement.

---

[3] The rights between the First Lien Lenders and the Second Lien Lenders are controlled by that certain Intercreditor Agreement among Miller, KeyBank and Apollo, dated as of June 2, 2014.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

### 3. Interests in MER.

41.    Common Stock.  MER's common stock is publically-traded and was listed and traded on the New York Stock Exchange ("NYSE") under the ticker symbol "MILL" through the end of July 2015.  As of September 29, 2015, MER had issued and outstanding approximately 46,673,223 shares of common stock.

42.    On April 23, 2015, Miller received a notice from NYSE Regulation, Inc. that it was not in compliance with the continued listing standards of the NYSE.  Such noncompliance was based on the average closing price of MER's common stock being less than $1.00 over a consecutive 30 trading-day period.  The Company received subsequent notifications based on its noncompliance with various average closing price and market capitalization criteria.  On July 30, 2015, NYSE Regulation, Inc. informed that Company that, effective after market close on July 30, 2015, it would suspend trading in MER's common stock, Series C Preferred Stock (defined below) and Series D Preferred Stock (defined below) and that it had initiated delisting proceedings.  The delisting proceedings were a result of MER's 30-day average market capitalization decreasing below $15,000,000.  On September 11, 2015, NYSE filed a notice of its intention to remove MER's common stock, Series C Preferred Stock and Series D Preferred Stock from listing and registration at the NYSE at the opening of business on September 22, 2015.

43.    Trading in MER's common stock and Series D Preferred Stock commenced on the OTC markets on July 31, 2015 under the ticker symbols "MILL" and "MILLO", respectively.  MER's Series C Preferred Stock is reported on the OTC under the symbol "MILLP," however there is no market maker in the stock and it is therefore eligible to trade in

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

20

HOU:3593019.6

the "Grey Market" on the basis of unsolicited orders to buy and sell.  Broker-dealers must report

Grey Market trades to FINRA, so trade data is available at http://www.otcmarkets.com and other

public sources.

44.     Series B Preferred Stock.  As of September 29, 2015, MER had 25,750 shares

issued and outstanding of 12% Series B Preferred Stock, with a redemption value of $100 per

share (the "Series B Preferred Stock").

45.     10.75% Series C Cumulative Redeemable Preferred Stock.  As of September 29,

2015, MER had 3,250,000 shares issued and outstanding of 10.75% Series C Cumulative

Redeemable Preferred Stock, with a redemption value of $25.00 per share (the "Series C

Preferred Stock").

46.     10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred

Stock.  As of September 29, 2015, MER had 3,499,723 shares issued and outstanding 10.5%

Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock, with a redemption

value of $25.00 per share (the "Series D Preferred Stock").  Miller is authorized to issue

4,000,000 shares of Series D Preferred Stock.

## II.      Events Leading to these Chapter 11 Cases.

47.     Oil prices have fallen significantly over the last year.  Miller is in default under

the Second Lien Credit Agreement, and Miller has been unable to raise additional capital to

refinance the Second Lien Lenders' debt.  Additionally, Miller does not have the capital to

continue a well drilling program to develop its proven undeveloped oil and gas reserves or the

liquidity sufficient to pay its operational expenses and debt service obligations.  Unless Miller

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

21

HOU:3593019.6

replaces the reserves it produces through successful development, exploration or acquisition activities, Miller's proved reserves and production will decline over time.

### A. Rapid Drop in Oil Prices and Sustained Low Prices

48.    Oil prices have plummeted and remained low over the last year.  The per-barrel price for Brent crude oil fell from more than $100 per barrel in September 2014 to less than $45 per barrel in January 2015 and then again to less than $45 per barrel in August 2015.  Recently, the per-barrel price of Brent crude oil has traded between approximately $45 - $50.  There remains great uncertainty in the oil market with a number of industry experts predicting continued depressed oil prices through 2016.  In addition, starting in April 2015, at the request of KeyBank, the Company unwound certain hedge agreements Miller had with KeyBank, eliminating the Company's protection from the cash flow impact of depressed oil prices.

### B. There are Payment and Non-Payment Events of Default Under the Second Lien Credit Agreement

49.    On September 30, 2015, Miller did not to make a quarterly interest payment in the amount of $5.8 million due under the Second Lien Credit Agreement.  Miller had insufficient liquidity to make the interest payment.  This is a payment default under the Second Lien Credit Agreement.

50.    There are also non-payment defaults under the Second Lien Credit Agreement, including, among others:

- Under the Second Lien Credit Agreement, Miller agreed to a debt covenant under which Miller covenanted that it would not have more than $5 million in accounts payable that are more than 90 days past due.  As of the start of October 2015, approximately $17.0 million of Miller's accounts payable were more than 90 days past due.  This is a default under the Second Lien Credit Agreement.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

22

HOU:3593019.6

- On March 9, 2015, a federal district court ruled against Miller in a civil suit styled *Vai Inc. v. Miller Energy Resources*, awarding the plaintiff a judgment in the amount of $7 million (the "VAI Verdict"). In addition, VAI has domesticated the judgment in various states in which Miller has assets and has been aggressive in its collection efforts. The existence of the VAI Verdict is a default under the Second Lien Credit Agreement.

- On August 6, 2015, the Securities and Exchange Commission (the "SEC") Division of Enforcement issued an order instituting administrative proceeding against MER, its former CFO (Paul W. Boyd), its former CEO (David M. Hall) and Carlton W. Vogt, III, the audit team leader for MER's former auditor. The SEC's Division of Enforcement alleges that after acquiring oil and gas properties in Alaska in late 2009, MER overstated their value. On August 14, 2015, MER reached an agreement with the staff of the Enforcement Division of the SEC (the "Staff"), pursuant to which the Staff has agreed to recommend, subject to SEC approval, settlement of the Action under which MER would pay $5 million to the SEC over 3 years. The issuance of the order instituting administrative proceeding against MER is an event of default under the Second Lien Credit Agreement.

- As discussed above, the Involuntary Petition was filed against CIE on August 6, 2015. The filing of the involuntary petition with no dismissal is also an event of default under the Second Lien Loan Agreement.

**C.     Efforts to Raise Capital Have not Been Successful**

51.     Over the last six months, Miller and its investment bankers at Seaport Global Securities, LLC ("SGS") have been working to restructure or refinance the Second Lien Lenders' debt. Miller and SGS began discussions in March with the Second Lien Lenders regarding a plan to refinance the existing debt through a combination of new financing and/or select asset sales. Management and SGS have met with more than 75 prospective lenders and potential asset purchasers as part of this capital raise process. Approximately 23 of the discussions with prospective lenders led to further discussion about the financing terms. Eight term sheets were received by the Company from these prospective lenders. Only one of the financing term sheets

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.*,
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

23

HOU:3593019.6

provided the Company with more than $165 million of new capital.  The Company also signed letters of intent with a prospective asset purchaser to close two separate sales.

52.     In July 2015, Miller engaged with a prospective lender concerning a loan in excess of $165 million to partially refinance the Second Lien Lenders' debt.  After undertaking initial due diligence and exchanging information and various proposals, the prospective lender and Miller executed a Letter of Understanding (the "Letter") setting forth the parameters pursuant to which the prospective lender and Miller would move forward with a potential refinancing.  However, approximately two months subsequent to the execution of the Letter, the prospective lender demanded that Miller pay approximately $1 million up-front to cover the prospective lender's fees and expenses in order to continue with the process.  The prospective lender also provided a revised timeframe estimating approximately 60 more days than originally contemplated to close.  The prospective lender cited the involuntary bankruptcy petition filed against CIE and the SEC's commencement of enforcement action as the principal reasons for its demanded up-front payment and additional time.  Miller did not agree to make the approximately $1 million payment and, as a result, the prospective lender terminated negotiations.

### D.      DIP Loan and Plan Term Sheet Discussions with the Second Lien Lenders

53.      With the termination of the refinancing negotiations, the Second Lien Lenders initiated discussions with Miller about a potential bankruptcy restructuring.  The discussions led to agreement on a plan term sheet (the "Plan Term Sheet") and $20 million of debtor-in-possession financing (the "DIP Financing").  The Second Lien Lenders conditioned providing the DIP Financing on agreement to the Plan Term Sheet.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

54.     The Plan Term Sheet provides the framework for a consensual restructuring with the Second Lien Lenders through a debt-to-equity swap pursuant to which the Second Lien Lenders would convert their outstanding claims into new first lien secured notes and 100% of the equity in the new company.  The Plan Term Sheet also provides unsecured creditors with a guaranteed minimum cash recovery and warrants to purchase equity in the new company, and provides existing preferred and common shareholders with warrants to purchase equity in the new company, assuming their respective classes vote in favor of the plan.  Significantly, the Plan Term Sheet provides a baseline recovery for all stakeholders, with the Debtors retaining the ability to seek and pursue other transactions that could potentially increase recovery to all stakeholders.

55.     The DIP Financing, along with cash collateral, will be used to fund the Debtors' reorganization efforts.  The DIP Facility is comprised of a delayed draw term loan facility in an aggregate principal amount of up to $20 million.  Subject to interim approval, Miller will immediately borrow up to $5 million, with the remaining $15 million becoming available to be drawn if the Debtors do not receive the full Tax Credit, estimated to be $21 million, from the State of Alaska within 30 days of the Petition Date.  Any draws on the DIP Facility will be advanced on a superpriority administrative claim basis and be secured by, subject to a carve-out, (i) a perfected first priority "priming" security interest on all prepetition and postpetition collateral that secures the claims under the Second Lien Credit Agreement; (ii) a perfected first priority security interest on all prepetition and postpetition unencumbered assets of the Debtors; and (iii) a perfected junior priority security interest on all prepetition and postpetition property of

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.*,
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

25

HOU:3593019.6

the Debtors that is not encumbered by a perfected, non-avoidable prepetition security interest other than the existing collateral.

56.     Each of the foregoing factors, among others, contributed to Miller's decision to seek relief under chapter 11 of the Bankruptcy Code.  Miller intends to restructure its debts and reorganize its business to provide the greatest possible recovery for the estates and stakeholders.

## III.   Evidentiary Support for First Day Motions.

57.     As discussed above, Miller has entered into chapter 11 with the goal of restructuring its debts to maximize value for all of its stakeholders.  To that end, concurrently with the filing of its chapter 11 petitions, Miller has filed a number of First Day Motions seeking relief that Miller believes is necessary to enable it to operate with minimal disruption and loss of productivity and protect and preserve its going concern value.  Miller requests that the relief sought in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating Miller's operations during the pendency of, these chapter 11 cases.

58.     I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.[4]

---

[4] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

26

A.   **Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 107(b), 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying Automatic Stay, and (vi) Scheduling Final Hearing (the "DIP Motion").**

59.   Miller requests authority to incur post-petition debtor-in-possession financing on the terms set forth in the DIP Motion (the "DIP Financing"). The DIP Financing is vital to Miller's continued operations and the preservation of value for all creditors and parties in interest. The DIP Motion and the exhibits attached thereto contain a description of the DIP Financing and key terms contained therein. I hereby adopt and incorporate the description from the DIP Motion as if fully set forth herein.

60.   Specifically, Miller requests entry of an interim order authorizing Miller to immediately borrow approximately $5 million under the proposed DIP Financing to avoid immediate and irreparable harm. Miller further seeks approval of up to an additional $15 million in financing on a final basis for a total of $20 million. Miller plans on using the expected approximately $21 million of Tax Credit proceeds to fund operations and the cost of the case and will use the incremental DIP Financing only to cover any shortfall. Miller has pursued several avenues for raising capital. After seeking alternative means for financing and reviewing all available options, the proposed DIP Financing is, in Miller's opinion, the best option for financing available to Miller to operate with minimal disruption and loss of productivity and protect and preserve its going concern value.

61.   The DIP Financing, in conjunction with cash collateral and the forthcoming Tax Credits, will be used to fund Miller's ongoing operating expenses and the administrative expenses of the bankruptcy cases as Miller pursues the restructuring set forth in the Plan Term

DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Sheet.  I believe that the relief requested in the DIP Motion is in the best interests of Miller's

estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate

its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf

of Miller, I respectfully submit that the DIP Motion should be approved.

> **B.      Emergency Motion for Order Under 11 U.S.C. §§ 105, 363 and 507, (i) Authorizing the Payment of Prepetition Employee Obligations and Related Amounts, (ii) Confirming Right of Debtors to Continue Employee Programs on Postpetition Basis, (iii) Confirming Right of Debtors to Pay Withholding and Payroll Related Taxes and (iv) Directing Banks to Honor Prepetition Checks for Employee Obligations (the "Wages and Benefits Motion").**

62.      Miller requests the authority, in its sole discretion, to pay prepetition claims,

honor obligations, and to continue programs, in the ordinary course of business and consistent

with past practices, relating to the Pre-Petition Employee Obligations (as defined in the Wages

and Benefits Motion).  I have reviewed the Wages and Benefits Motion and I am familiar with

description of the programs and benefits described therein.  Such descriptions are true and

correct and I hereby adopt and incorporate such descriptions as if fully set forth herein.

63.      As of the Petition Date, the Debtors' aggregate workforce consists of

approximately 95 Employees.  Of those 95 Employees, (i) Miller Energy Resources, Inc.

("MER") employs 16 Employees; (ii) Cook Inlet Energy, LLC ("CIE") employs 43 Employees

(24 of which are paid on an hourly basis and 2 of which are paid on a day rate basis); and (iii)

Nutaaq Operating, LLC ("Nutaaq") employs 36 Employees (24 of which are paid on an hourly

basis and 8 of which are paid on a day rate basis).

64.      The majority of Miller's Employees rely exclusively on their compensation,

benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently,

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

these Employees will be exposed to significant financial difficulties if Miller is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if Miller is unable to satisfy such obligations, Employee morale, focus and loyalty will be jeopardized at a time when Employee support is critical to Miller.  In the absence of such payments, Miller believes its Employees will seek alternative employment opportunities, perhaps with Miller's competitors, thereby hindering Miller's ability to meet its obligations, diminishing creditors' confidence in Miller, and slowing down the reorganization process.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when Miller should be focusing on stabilizing its operations as it works to reorganize its business.

65.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 without disruption.  Accordingly, on behalf of Miller, I respectfully submit that the Wages and Benefits Motion should be approved.

**C.    Emergency Motion for Authority to Pay in the Ordinary Course  Undisputed Prepetition Royalties and Continue such Payments Postpetition (the "Royalty Motion").**

66.    Miller requests entry of an order authorizing Miller to pay in the ordinary course undisputed prepetition royalties (the "Royalties") and continue such payments postpetition.  I have reviewed the Royalty Motion and I am familiar with the description of Miller's oil and gas operations and the consequences for failure to pay Royalties on account of such operations as set forth therein.  Such descriptions are true and correct and I hereby adopt and incorporate such descriptions as if fully set forth herein.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.*,
**IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

29

HOU:3593019.6

67.     As an oil and gas exploration and production company, payment of royalties on a timely basis is vital to the continued operation of Miller's business.  Failure to timely pay royalties due under oil and gas leases can lead to potential lease forfeiture or substantial penalties under such leases which would adversely affect Miller's operations to the detriment of all parties in interest.   Additionally, failure to timely pay such Royalties could prevent Miller from obtaining future leases as its failure to pay Royalties could negatively impact the timeliness and effectiveness of the Miller's reorganization.  Accordingly, payment of such obligations is vital to the continued operation of Miller's business in order to maintain value.

68.     I believe that the relief requested in the Royalty Motion is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of Miller, I respectfully submit that the Royalty Motion should be approved.

**D.      Emergency Motion for Order Under 11 U.S.C. §§ 105, 345, 363, 364, 1107, and 1108 (i) Authorizing the Continued Use of Existing Bank Accounts, Business Forms and Cash Management System; (ii) Waiving Requirements of Section 345 of the Bankruptcy Code; and (iii) Authorizing Continuation of Intercompany Transactions (the "Bank Account Motion").**

69.     Miller requests the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in its Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of Miller as debtors in possession; (c) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to their status as debtors in possession; (d) maintain its existing investment practices and waiver of the requirements of section 345 of the Bankruptcy Code and

DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

30

HOU:3593019.6

(e) continue performing intercompany transactions in the ordinary course of business.  I have reviewed the Bank Accounts Motion and I am familiar with description of the accounts and cash management system set forth therein.  Such descriptions are true and correct and I hereby adopt and incorporate such descriptions as if fully set forth herein.

70.    In addition, Miller further requests that the Court authorize the banks to: (a) continue to maintain, service, and administer the bank accounts and (b) debit the bank accounts in the ordinary course of business on account of checks drawn on the bank accounts that are presented for payment at the banks or exchanged for cashier's checks prior to the Petition Date.

71.    In the ordinary course of business, Miller utilizes an integrated Cash Management System to collect, transfer, and disburse funds generated by its operations and maintains current and accurate accounting records of all daily cash transactions.  If Miller was required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt Miller's business at this critical time.  Miller respectfully submits that parties in interest will not be harmed by its maintenance of the existing cash management system, including its Bank Accounts, because Miller has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

72.    Miller also adheres to certain investment practices, which Miller believes will provide the protection contemplated by section 345(b) of the Bankruptcy Code, while providing

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL*.,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

HOU:3593019.6

additional interest income. Therefore, Miller seeks a waiver of strict compliance with the requirements of section 345(b) of the Bankruptcy Code.

73. In addition, in the ordinary course of business, Miller enters into certain intercompany transactions as necessary to ensure the business runs smoothly. If the intercompany transactions are discontinued, a number of services provided by and to Miller would be disrupted and could affect Miller's ability to pay wages and benefits to its employees and make timely payments to vendors.

74. The relief requested in the Bank Account Motion is vital to ensuring Miller's seamless transition into bankruptcy. Authorizing Miller to maintain its Cash Management System will avoid many of the possible disruptions and distractions that could divert its attention from more critical matters during the initial days of these chapter 11 cases.

75. I believe that the relief requested in the Bank Account Motion is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of Miller, I respectfully submit that the Bank Account Motion should be approved.

**E.     Emergency Motion for Order Granting Additional Time to File Schedules, Statements of Financial Affairs, and List of Equity Holders Pursuant to 11 U.S.C. §521(1) and Fed R. Bankr. P. 1007(b) (the "Schedules and Statements Motion")**

76. Miller requests entry of an order granting Miller an additional 16 days, for a total extension of 30 days, to file their schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules and Statements").

DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

32

HOU:3593019.6

77.     Miller and its wholly-owned subsidiaries have a substantial number of creditors and parties-in-interest and conduct their business operations from several locations in the United States.  Completion of the Schedules and Statements will require an expenditure of a significant amount of time and effort by Miller's employees.  Many of those employees have been and will continue to be simultaneously working on other aspects of Miller's bankruptcy efforts and endeavoring to stabilize operations by addressing the myriad of employee, customer and vendor issues raised by the chapter 11 filings.

78.     I believe that the relief requested in the Schedules and Statement Motion is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Allowing for the sixteen day extension (for a total of 30 days to file the Schedules and Statements) will allow Miller and its employees to focus on the transition to operating in chapter 11 and still ensure that the information from the Schedules and Statements is provided in a timely manner.  Accordingly, on behalf of Miller, I respectfully submit that the Schedules and Statement Motion should be approved.

**F.      Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments (the "Utilities Motion").**

79.     In the ordinary course of business, Miller incurs expenses for gas, water, sewer, electric, telecommunications, internet access, and other similar utility services provided by approximately 16 utility providers. Uninterrupted utility services are essential to Miller's ongoing operations and, therefore, to the success of its reorganization.  Indeed, any interruption of utility services, even for a brief period of time, would negatively affect Miller's operations, customer relationships, and revenues, seriously jeopardizing Miller's reorganization efforts and,

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.***, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

ultimately, creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

80.     Miller requests the entry of interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving Miller's proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of Miller's proposed adequate assurance pending entry of the Final Order; (d) determining Miller is not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order; and (e) setting a final hearing on Miller's proposed adequate assurance.

81.     I believe and am advised that the proposed procedures are necessary in these chapter 11 cases, because if such procedures were not approved, Miller could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases.  Moreover, a Utility Provider could blindside Miller by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize a successful reorganization in these chapter 11 cases.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

34

HOU:3593019.6

82.     I believe that the relief requested in the Utilities Motion is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of Miller, I respectfully submit that the Utilities Motion should be approved.

**G.     Debtors' Emergency Motion Seeking Authority to (A) File a Consolidated Creditor Matrix; and (B) Implement Certain Notice Procedures (the "Matrix and Service Motion")**

83.     Miller requests authority to file a consolidated creditor matrix and establish a Master Service List and certain case procedures to be used in these cases.  Requiring each of the Debtors to file a separate creditor matrix in each of their respective cases would be unduly burdensome, would consume an excessive amount of Miller's time and resources and would not provide meaningful new information.

84.     Additionally, a large number of creditors and parties in interest may be entitled to receive notice in these cases.  As such, service of all documents filed in these cases to each creditor and party in interest would be extremely burdensome and costly to the estates.  Miller, therefore, requests authority to establish a Master Service List that would include: (a) the Office of the United States Trustee for the Southern District of Alaska (b) all known or alleged secured creditors, (c) the 30 largest unsecured non-insider creditors of the Debtors (on a consolidated basis), (d) all known shareholders holding over 5% of a class of equity interests of MER, (e) all Debtor professionals, (f) all members of any official committee of unsecured creditors that may be appointed, (g) counsel for, and any professionals retained by, any official committee of unsecured creditors that may be appointed, (h) the United States Attorney's Office for the Southern District of Alaska, (i) the Internal Revenue Service, (j) any persons who have filed a

DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

35

HOU:3593019.6

request for notice pursuant to Bankruptcy Rule 2002, (k) the SEC, and (l) any such other government agencies to the extent required by the Bankruptcy Rules and Local Rules.

85.     The proceedings with respect to which notice would be limited to the Master Service List would include all matters covered by Bankruptcy Rule 2002, with the express exception of the following: (a) notice of (i) the first meeting of creditors pursuant to section 341 of the Bankruptcy Code, (ii) the time fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c), (iii) the time fixed for filing objections to, and the hearings to consider, approval of a disclosure statement and confirmation of a plan of reorganization, (iv) the time fixed for filing objections to, and the hearings to consider any motion seeking approval of a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or any bid procedures or related relief with respect to such a sale transaction; and (b) notice and transmittal of ballots for accepting or rejecting a plan of reorganization. Notice of the foregoing matters would be given to all parties in interest in accordance with Bankruptcy Rule 2002, unless the Court orders, or the Bankruptcy Code prescribes, otherwise.

86.     Accordingly, I believe that the relief requested in the Matrix and Service Motion is in the best interests of Miller's estates, its creditors, and all other parties in interest.  Filing a single creditor matrix and establishing a Master Service List and the procedures set forth in the Matrix and Service Motion will promote efficiency in these cases and help the estates avoid substantial administrative costs while still providing notice to a substantial number of creditors and parties in interest, including all parties requesting such notice.  Accordingly, on behalf of Miller, I respectfully submit that the Matrix and Service Motion should be approved.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*,**
**IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

36

HOU:3593019.6

**H.    Emergency Motion for Order Establishing Case Procedures (the "Case Procedures Motion")**

87.    Miller requests entry of an order approving the procedures for setting hearings and noticing motions (the "Procedures") set forth in the Case Procedures Motion.  Approving the Case Procedures Motion will streamline notices and hearings in these cases and reduce administrative burden on the Court, Miller, and other parties in interest.

88.    Specifically, the proposed Procedures would establish a uniform hearing day and time as the day and time reserved for hearings in these cases.  The Procedures also provide for a uniform negative notice language to go on all pleadings as well as a requirement for filing hearing agendas for the benefit of the Court and parties in interest.

89.    I believe that the relief requested in the Case Procedures Motion is in the best interests of Miller's estates, its creditors, and all other parties in interest.  Streamlining hearing dates and motion practice as set forth in the Case Procedures Motion will reduce the administrative burden on the Court and parties in interest in these cases.  Accordingly, on behalf of Miller, I respectfully submit that the Case Procedures Motion should be approved.

**I.    Emergency Motion for Order under Fed. R. Bankr. P. 1015(b) and Bankruptcy Local Rule 1015 Directing Joint Administration of Cases (the "Joint Administration Motion")**

90.    Miller requests entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  Miller requests that the Court maintain one docket for all of these chapter 11 cases under the case of Cook Inlet Energy, LLC and also requests that an entry be made on the docket of each of Miller's chapter 11 cases, other than Cook Inlet Energy, LLC, to reflect the joint administration of these chapter 11 cases.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.***,
IN  SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

HOU:3593019.6

91.     Given the integrated nature of Miller's operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect Miller Energy Resources, Inc. and each of its subsidiaries that also have filed chapter 11 cases.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

92.     I believe that the relief requested in the Joint Administration Motion is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Accordingly, on behalf of Miller, I respectfully submit that the Joint Administration Motion should be approved.

**J.      Application for Entry of an Order Authorizing the Employment and Retention of Andrews Kurth LLP as Counsel to the Debtors (the "Andrews Kurth Retention Application").**

93.     Miller requests entry of an order authorizing the retention of Andrews Kurth LLP ("Andrews Kurth").  Andrews Kurth has been corporate restructuring counsel for Miller in the past and is intimately familiar with all aspects of Miller's operations and business.  Additionally, Andrews Kurth has assisted Miller in preparing for filing these cases and is more than capable of representing Miller as lead counsel.

94.     I believe that the relief requested in the Andrews Kurth Retention Application is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.*,
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Accordingly, on behalf of Miller, I respectfully submit that the Andrews Kurth Retention Application should be approved.

**K.    Debtors' Application Pursuant to Sections 327 and 328 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Retain Seaport Global Securities, LLC as the Debtors' Investment Banker and Financial Advisor (the "Seaport Global Retention Application").**

95.    Miller requests entry of an order authorizing the retention of Seaport Global Securities, LLC ("SGS") as investment banker and financial advisor to the Petition Date.  SGS has been working with Miller and assisting in Miller's efforts to obtain financing and restructure its debts since March 2015.  As such, SGS is intimately familiar with Miller's finances, cash flow and capital structure.

96.    I believe that the relief requested in the Seaport Global Retention Application is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Accordingly, on behalf of Miller, I respectfully submit that the Seaport Global Retention Application should be approved.

**L.    Application for Entry of an Order Authorizing the Employment and Retention of David H. Bundy, P.C. as Local Bankruptcy Counsel to the Debtors (the "Bundy Retention Application").**

97.    Miller requests entry of an order authorizing the retention of David H. Bundy, P.C. ("Bundy") nunc *pro tunc* to the Petition Date as local counsel.  Bundy has served as counsel for Miller since filing of the involuntary petition against CIE and is familiar with Miller, its assets and its operations.

DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

39

HOU:3593019.6

98.    I believe that the relief requested in the Bundy Retention Application is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of Miller, I respectfully submit that the Bundy Retention Application should be approved.

**M.    Application of the Debtors for an Order Authorizing the Retention of Prime Clerk, as Official Claims, Noticing and Balloting Agent (the "Prime Clerk Retention Application").**

99.    Miller requests entry of an order pursuant to section 156(c) of title 28 of the United States Code, section 503(b) of the Bankruptcy Code authorizing the employment and retention of Prime Clerk ("Prime Clerk"), effective as of the Petition Date as the notice and claims agent in accordance with the terms and conditions set forth in the Services Agreement.

100.    I believe that the relief requested in the Prime Clerk Retention Application is in the best interests of Miller's estates, its creditors, and all other parties in interest, and will enable Miller to continue to operate its businesses in chapter 11 with the least amount of disruption possible.  Prime Clerk is a leading claims agent for chapter 11 cases and will be of great assistance to the Debtors in handling administrative matters, such as noticing motions and maintaining a claims register, allowing the Debtors to focus their efforts on the chapter 11 process.  Accordingly, on behalf of Miller I respectfully submit that the Prime Clerk Retention Application should be approved.

*[Remainder of Page Intentionally Left Blank]*

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC., *ET AL.*, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

HOU:3593019.6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 1, 2015
Houston, Texas

_Carl F. Giesler, Jr._
_____
Carl F. Giesler, Jr.
Chief of Executive Officer
Miller Energy Resources, Inc.

**DECLARATION OF CARL F. GIESLER, JR., CHIEF EXECUTIVE OFFICER OF MILLER ENERGY RESOURCES, INC.,** *ET AL.,*
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**