## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

In re:

COOK INLET ENERGY, LLC, et. al.,[1]

Debtors.

Case No. A15-00236-GS
Chapter 11

## MEMORANDUM ON APPLICATION OF SCOTT M. BORUFF FOR
## ADMINISTRATIVE EXPENSE CLAIM (ECF No. 591)

Scott M. Boruff has filed an Application for Administrative Expense Claim ("Application")(ECF No. 591), in which he seeks to recover the sum of $252,657.53, representing the prorated portion of his contractual salary as executive chairman for Miller Energy Resources, Inc. ("MER") for the four month period between the filing of MER's chapter 11 petition and plan confirmation. Having considered the testimony of the witnesses and the documentary evidence presented at the evidentiary hearing held May 17, 2017, and for the reasons stated below, the court shall award Boruff the sum of $15,000.00 as an administrative expense under 11 U.S.C. § 503(b)(1)(A). The court finds that Boruff has not proven the reasonable value of his post-petition services in excess of what other directors on the MER board were paid for their post-petition services.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Cook Inlet Energy, LLC, an Alaska limited liability company (6643); Miller Energy Resources, Inc., a Tennessee corporation (8629); Miller Energy Services, LLC, a Delaware limited liability company (8670); Miller Energy GP, LLC, a Delaware limited liability company (0999); Miller Rig & Equipment, LLC, a Delaware limited liability company (8727); Miller Drilling, TN LLC, a Tennessee limited liability company (8891); East Tennessee Consultants, Inc., a Tennessee corporation (3108); East Tennessee Consultants II, L.L.C., a Tennessee limited liability company (0107); Anchor Point Energy, LLC, an Alaskan limited liability company (7946); Savant Alaska, LLC, a Colorado limited liability company (0579); and Nutaaq Operating LLC, an Alaska limited liability company (2908). The term "Debtors" used within this Memorandum refers to the debtors in the jointly administered cases collectively.

## I.        Procedural History.

An involuntary chapter 11 petition was filed against Cook Inlet Energy, LLC ("CIE"), a subsidiary of MER, on August 6, 2015.  CIE filed an answer and consent to entry of an order for relief under chapter 11 on October 1, 2015, the same day that MER and several of its other subsidiaries filed their own chapter 11 petitions.[2]   An   Emergency Motion for Joint Administration was granted on October 8, 2015, and the CIE bankruptcy became the lead case herein.[3]

MER's history, and the events that lead it and its subsidiaries to seek chapter 11 relief, are detailed in the Disclosure Statement to Accompany Joint Plan of Reorganization of [MER] and its Debtor Subsidiaries Under Chapter 11 of the Bankruptcy Code.[4]  To briefly summarize, MER and its subsidiaries were independent oil and natural gas exploration and production companies that focused on developing oil and gas properties in Alaska.[5]  MER itself was a publicly traded holding company that owned, either directly or indirectly, the other subsidiary companies in these jointly administered cases.[6]  A confluence of three events precipitated the joint bankruptcy filings.  First, in the year prior to the filing of the chapter 11 petitions, oil prices dropped significantly, from more than $100 per barrel to less than $45 per barrel.[7]  Second, MER defaulted on a credit agreement with its secured lenders, Apollo Investment Corporation, and

---

[2] ECF No. 51.

[3] ECF No. 101.

[4] ECF No. 365.

[5] *Id.* at 22.

[6] *Id.*

[7] *Id.* at 30.

Highbridge Capital Strategies (collectively, "Lenders").[8]  Finally, MER's prepetition efforts to raise additional capital or sell off some or all of its assets were unsuccessful.[9]  MER had been working with investment bankers at Seaport Global Securities ("SGS") to restructure or refinance its secured debt for six months before seeking bankruptcy relief.[10]  MER obtained court approval to retain SGS within the bankruptcy,[11] and SGS continued its efforts to procure financing or restructure MER's debts up to the date of plan confirmation.[12]

Boruff was part of MER's senior management group.[13]  At the time the petition was filed, he held the position of executive chairman.[14]  Not only did he serve on MER's board of directors, he was also its largest individual shareholder.[15]  Yet, in the Notices of Intent to Take Compensation ("Notices of Intent") filed contemporaneously with, and amended shortly after, the petition, Boruff was not included in the list of officers whose salaries would be paid postpetition.[16]  No evidence was presented that the Notices of Intent were sent to Boruff.

---

[8] Discl. Statement, ECF No. 365 at 27, 30.  MER had both payment and non-payment defaults.  It failed to make a $5.8 million quarterly interest payment due under the credit agreement.  Non-payment defaults included a breach of a covenant in the credit agreement, in that MER's accounts payable more than 90 days past due exceeded $5 million.  Another event of default occurred on August 6, 2015, when the SEC issued an order instituting an administrative proceeding against MER and certain of its officers.  *Id.* at 30. The filing of the involuntary petition against CIE, without dismissal, was yet another event of default under the credit agreement.  *Id.* at 31.

[9] *Id.* at 31.

[10] *Id.*

[11] ECF No. 271.

[12] Discl. Statement, ECF No. 365 at 31.

[13] MER Ex. 24 (Oral Deposition of Scott M. Boruff), at 5:12-22; 12:17-15:10.

[14] ECF No. 1427 at 146:2-3.

[15] *Id.* at 59:23-60:1.

[16] *See* Notice of Intent to Take Compensation Pursuant to AK LBR 2016-2, filed Oct. 1, 2015 (ECF No. 60); Am. Notice of Intent to Take Compensation Pursuant to AK LBR 2016-2, filed Oct. 4, 2015 (ECF No. 71).  These notices reflect that MER's chief executive officer and director, Carl Giesler, would continue

Four days after entering bankruptcy, the Debtors filed their Notice of Debtors' Plan Term Sheet detailing the terms on which they would propose their joint plan of reorganization funded by the Lenders.[17] The joint debtors continued to move expeditiously to confirmation, filing their Amended Joint Plan of Reorganization of [MER] and Certain of its Subsidiaries Under Chapter 11 of the Bankruptcy Code roughly two and one half months postpetition, on December 17, 2015.[18] Consistent with the provisions of the plan and disclosure statement, a Notice of Intent to Assume or Reject Executory Contracts and Unexpired Leases and Cure Amount Related to Such Assumption was subsequently filed on January 20, 2016.[19] Boruff's employment agreement with MER was listed as one of the contracts being rejected under this notice.[20]

The hearing on plan confirmation was held on January 27, 2016. The Order Confirming Joint Plan of Reorganization of [MER] and Certain of its Subsidiaries Under Chapter 11 of the Bankruptcy Code was entered the same day.[21] Under the terms of the confirmed plan, Boruff's employment contract was rejected. Boruff did not receive any portion of his contractual salary postpetition. He now seeks an award of $252,657.53 as an administrative expense claim, representing the prorated portion of his annual salary through the date of plan confirmation.

## II.    Boruff's History with MER.

---

to receive monthly salary of $66,667, and four other officers in MER would receive monthly salaries ranging from $25,000 to $35,833.

[17] Boruff Ex. 34.

[18] ECF No. 364.

[19] ECF No. 469.

[20] *See* ECF No. 469-1 at 15.

[21] ECF No. 502.

4

Boruff was hired by MER in August 2008 as its chief executive officer.[22] He held this position until September 2014, when Carl Giesler replaced him in this position.[23] Boruff testified that Giesler was retained because MER's operations had grown substantially.[24] The company's employees had mushroomed from 12 at the time Boruff came on board to more than 100 in 2014, and MER's Alaska operations had grown from 8 to roughly 3,500 barrels per day.[25] Boruff said Giesler was hired to help MER grow on a different level, and with Giesler on board, Boruff would be able to focus more on the "big picture stuff," such as putting financing deals together.[26]

Contemporaneously with Giesler's hiring, Boruff entered into a new employment agreement with MER, under which he would serve as its executive chairman.[27] His employment contract described his duties as:

> (i) to oversee, manage and direct the Company's future development of its current business plan and model and to develop potential future areas of business, (ii) to oversee, manage and direct the Company's mergers and acquisitions of new areas of the company's business, and (iii) subject to terms of this Agreement, any other duties as may reasonably be assigned or delegated to him from time to time by the Board of Directors.
>
> Notwithstanding the foregoing, [Boruff] shall be principally responsible for and shall have full power and authority to perform all duties incidental to the general management and oversight of

---

[22] ECF No. 1427 at 8:9-11.

[23] *Id.* at 8:14-15.

[24] *Id.* at 10:17-20.

[25] *Id.* at 10:11-20.

[26] *Id.* at 10:20-25.

[27] Amendment and Restatement of Employment Agreement, Boruff Ex. 1 at 1.

the Company's future development plans, and mergers and acquisitions.[28]

Boruff described his role as a working chairman and member of management.[29] He stated that he did essentially the same things he had done before as CEO, while Geisler focused more on "operational roles" with MER.[30] Although Giesler testified that Boruff's job responsibilities "diminished modestly" when he became executive chairman, he noted that Boruff no longer had active management duties, and was not responsible for MER's day to day operations.[31] In his deposition testimony, Giesler described Boruff's pre-bankruptcy job functions as: 1) director of the company, 2) to help facilitate growth of the business, and 3) to serve as an active member of senior management; "sort of an advisor, contributing ideas and participating in discussions on a regular basis."[32] As for Boruff's second job function, facilitating growth of the business, Giesler noted that this role was never clearly defined to him. It appeared to include such things "as providing historical information and insight from [Boruff's] background and knowledge of the company" to help with thinking about strategic elements, including mergers, acquisitions, and financing.[33]

Before MER's bankruptcy was filed, Boruff was receiving an annual salary of $795,000, or $66,250 per month.[34] Giesler's annual salary was $800,000.[35] Boruff also had health

---

[28] Amendment and Restatement of Employment Agreement, Boruff Ex. 1 at 2-3; MER Ex. 15 at 3.

[29] ECF No. 1427 at 11:22-23.

[30] *Id.* at 11:23-25.

[31] *Id.* at 110:1-17.

[32] MER Ex. 25 (Oral Deposition of Carl F. Giesler, Jr.), at 9:12-10:6.

[33] *Id.* at 9:19-10:1.

[34] Boruff Ex. 2 at 1.

[35] ECF No. 1427 at 129:20-130:1.

insurance through MER,[36] and other benefits, including a business cell phone and email account. Pre-petition, Boruff typically conducted MER business by telephone or email from his home in Knoxville, Tennessee, but would occasionally travel to Alaska and to Houston, where MER's main offices were located.[37] He would also occasionally travel to New York, Florida, or other locations to meet with potential investors.[38] Giesler stated that he believed these actions were of value to MER.[39]

After the precipitous drop in oil prices in late 2014, Boruff said MER spent the next six months trying to "lean up."[40] He noted that Giesler was particularly good at this but that he also devoted his efforts to reducing MER's debt.[41] He testified that he directed his efforts to trying to find suitors willing to enter a joint venture with MER or purchase its assets.[42] Between March and September 2015, Boruff traveled to trade shows, attended oil and gas conferences, and visited Houston several times to meet with potential suitors.[43] He also testified that he would go on road shows with Giesler and "listen to the pitch."[44]

At the September 23, 2015, special meeting of MER's board of directors, over which Mr. Boruff presided, the board discussed the establishment of a Restructuring Committee to solicit

---

[36] Boruff Ex. 2 at 4-5.

[37] MER Ex. 25 (Oral Deposition of Carl F. Giesler, Jr.), at 103:9-20. Giesler noted that he traveled much more frequently than Boruff, and typically traveled to Alaska at least once a month. *Id.* at 104:3-6.

[38] *Id.* at 104:7-18.

[39] *Id.*

[40] ECF No. 1427 at 13:3-24.

[41] *Id.* at 13:3-14:8.

[42] *Id.* at 14:16-18.

[43] *Id.* at 14:7-18.

[44] *Id.* at 14:21-25.

offers to purchase MER or its assets, even post-bankruptcy or while pursuing the Lender's plan to purchase the company.[45]  At another special meeting held on September 30, 2015, the day before MER's bankruptcy filing, the board of directors unanimously adopted:

> authorization to file the Chapter 11 case, the approval of the DIP loan, the approval of the plan term sheet and the approval of the formation of a Restructuring Committee.  It was noted for the record that [SGS] worked hard to find alternatives, but potential interested parties believe the value runs out before the Second Lien Debt is even repaid.  It was also noted that [SGS] will continue their efforts to find other alternatives and will report weekly to the Restructuring Committee on their efforts.[46]

The Restructuring Committee initially excluded Boruff and was comprised solely of Giesler, as MER's CEO, and the independent members of the MER Board.[47]  Giesler testified that Boruff's exclusion from the committee was due to his status as MER's largest shareholder as he was not an independent board member.[48]  Giesler suggested that Boruff's equity stake in MER could create a potential for "misalignment" with the Restructuring Committee as to how long MER should pursue other financing alternatives.[49]

### III.  Boruff's Post-petition Services.

Boruff received his salary and benefits up to MER's bankruptcy petition, but did not receive any post-petition compensation.[50]  Giesler explained that the Lenders imposed

---

[45] Boruff Ex. 9 at Boruff00031.

[46] Boruff Ex. 10 at Boruff00034.

[47] ECF No. 1427 at 124:16-125:5.

[48] *See* MER Ex. 25 (Oral Deposition of Carl F. Giesler, Jr.), at 61:10-63:6. The evidence, including Boruff's testimony, reflects that management was concerned with the shareholders' reaction to the bankruptcy and Boruff's potential involvement.  Boruff testified that much of his post-petition efforts were directed towards managing investor relations.  ECF No. 1427 at 51:10-13.

[49] *See* MER Ex. 25 (Oral Deposition of Carl F. Giesler, Jr.), at 60:11-63:6.

[50] MER Ex. 24 (Oral Deposition of Scott M. Boruff), at 87:15-18.

restrictions upon the use of their cash collateral within the bankruptcy and had informed MER that they did not want to fund Boruff's salary post-petition, which was essentially the same amount being paid to Giesler as CEO.[51]  Giesler understood that Jeff Bartlett with Apollo, who had a longer working relationship with Boruff than he did, wanted to inform Boruff that he would not be paid his salary post-petition.[52]  Giesler testified that the Lenders had told him on October 2, 2015 that they had phoned Boruff to inform him that he would not be paid.[53]  Boruff denies ever receiving such a call.[54]   In support of Giesler's testimony, MER points to an appointment entry detailing a scheduled phone call between Boruff and Bartlett set for 9:30 a.m. on October 2, 2015.[55]   The entry includes the phone number to be used and a passcode. Moreover, Boruff's phone records reflect a 25 minute phone call on October 2, 2015 made to the same phone number shown in the appointment entry.[56]  Bartlett did not testify, however, and Boruff does not recall the conversation.[57]

Boruff believes that he first learned that MER would not pay his salary from one of MER's investors.[58]  He testified that he was furious when he heard this information, and attempted to verify this news by sending emails to Giesler and Kurt Yost, MER's senior vice

---

[51] MER Ex. 25 (Oral Deposition of Carl F. Giesler, Jr.), at 96:19-27:7.

[52] *Id.* at 99:20-100:6.

[53] *Id.*

[54] MER Ex. 24 (Oral Deposition of Scott M. Boruff), at 82:14-25.

[55] MER Ex. 22.

[56] MER Ex. 2 at 17.

[57] MER Ex. 24 (Oral Deposition of Scott M. Boruff), at 82:14-25.

[58] ECF 1427 at 25:22-25.

president and general counsel.[59]  Boruff did not receive any responses to these emails,[60] but had

at least one conversation with Giesler about MER's decision not to pay his compensation.[61]  In

an email dated November 13, 2015, he wrote to Giesler and Yost, "Carl per our conversation

please confirm for me that you were told by Apollo to cancel my miller email and health

insurance as well S [sic] not to pay me."[62]  Boruff resent this email on November 16, 2015.[63]  He

testified that it wasn't until the third week of November 2015, when he went to the office, that

Yost confirmed that he would not be paid.[64]

Boruff points out that no one ever instructed him to stop working.[65]  He maintains that he

continued to do the same work post-petition as he did before the bankruptcy filing.[66]  According

to Boruff he worked "day in, day out trying to get somebody to buy [MER's] assets," and had

several phone conversations with various contacts to try to find a deal.[67]  Boruff had been

involved with potential asset purchasers pre-petition, and testified that he continued to contact

parties interested in MER after the bankruptcy filing.[68]  He specifically identified Hilcorp,

Brooks Range, John Nix, and Great Bear as parties he contacted post-petition to solicit offers.[69]

---

[59] *Id.* at 27:2-19.

[60] *Id.* at 27:16-19.

[61] *Id.* at 99:16-21.

[62] MER Ex. 37.

[63] *Id.*

[64] ECF No. 1427 at 28:15-29:1.

[65]  MER Ex. 24 (Oral Deposition of Scott M. Boruff), at 103:1-8.

[66]  *Id.* at 87:23-88:7.

[67] ECF 1427 at 57:13-21.

[68] *Id.* at 66:13-16.

[69] *Id.* at 66:17-67:1.

However, Boruff admitted that none of these entities ever submitted a binding offer to purchase assets post-petition.[70]  He points out that he pressed on in his efforts even after he learned he wouldn't be paid and believes that MER and the Lenders thwarted his efforts by trying to keep him in the dark.[71]

The parties admitted into evidence cell phone records Boruff produced in discovery in an effort to detail his post-petition efforts.  The records reflect that post-petition, 38 minutes of his time was expended on phone calls with Brooks Range, 2 hours and 7 minutes of phone time to John Nix, and no phone time was logged for calls to Great Bear or Hilcorp.[72]  Boruff also spent 32 minutes of phone time with an individual from SGS, the investment banker that had assumed the lead in finding a buyer for MER.[73]  Boruff asserted that his home phone records and text messages would show significantly more time,[74] and he offered to share one text message that he had discovered on his cell phone while flying up to Anchorage for the hearing.[75]  However, because Boruff failed to produce such records in pre-hearing discovery, he was not permitted to supplement the record with this purported evidence.[76]

---

[70] ECF No. 1427 at 67:2-69:8.  In fact, at the evidentiary hearing, Boruff confirmed that after the "Badami acquisition in late 2014" he wasn't involved in any other asset acquisitions on behalf of MER.  ECF No. 1427 at 69:12-15.  In the months before and after the petitions were filed, he never received a binding offer for any of the Debtors' assets that could be presented to MER and SGS.

[71] ECF No. 1427 at 68:7-14.

[72] MER Ex. 23.

[73] *Id.*

[74] ECF No. 1427 at 70:19-72:16; 75:24-76:3.

[75] *Id.* at 27:19-25.

[76] Boruff's application for administrative expenses was filed more than a year ago, on April 28, 2016.  The evidentiary hearing was initially scheduled for October 18, 2016, but was continued several times by stipulation of the parties and due to court scheduling conflicts.  *See* ECF Nos. 1065, 1066, 1139, 1215, 1258, 1371.  The hearing was ultimately held on May 17, 2017.  The court finds that Boruff has had more than ample time to compile any records he might have that would substantiate his claim for an administrative expense.

Boruff was added to MER's Restructuring Committee on October 29, 2015 by the MER board.[77] The Restructuring Committee received a "score card" from SGS on roughly a weekly basis, that tracked SGS's negotiation progress with a list of potential buyers for a variety of the Debtors' assets.[78] The January 26, 2016 score card reflected that a total of 77 entities had been contacted, and indicated which of the potential buyers had "passed" on further negotiations, which ones were still interested, and the ongoing status of the negotiations.[79] It also briefly itemized the chronology of SGS's efforts with respect to each of the prospective buyers.[80]

A review of the January 26, 2016 score card reflects that SGS was working with Hilcorp, Brooks Range, and Great Bear - three of the four entities Boruff specifically identified as interested parties.[81] Giesler was also in the loop with respect to Hilcorp. He had emailed Boruff prepetition, on August 31, 2015, seeking to "confirm we're pencils down with Hilcorp right now," pending work on another financing option for the Debtors.[82] Giesler also noted that MER had "a variety of relationships with Hilcorp," and that others in MER besides Boruff had meaningful and constructive relationships with certain individuals at Hilcorp.[83] Finally, Giesler testified that, after the bankruptcy was filed, Boruff was no longer involved in day to day communication or decision making, regarding company financing or operations.[84] He said

---

[77] MER Ex. 12 at 2.

[78] *See* Boruff Exs. 14-20, comprised of copies of emails from Benjamin Meisel at SGS to the Restructuring Committee, including Boruff, between November 20, 2015 and January 26, 2016.

[79] *See* Boruff Ex. 20.

[80] *Id.*

[81] *Id.*

[82] MER Ex. 25 (Oral Deposition of Carl F. Giesler, Jr.), at 36:4-39:1.

[83] *Id.* at 37:13-25.

[84] *Id.* at 102:10-15.

Boruff "was not requested nor did he in actuality do anything to further strategic alternatives that really benefitted the company. That role had basically been assigned to [SGS], more or less, exclusively."[85] Boruff "just ceased to become involved in everyday operations as an executive of the company."[86]

Boruff did preside over three post-petition special meetings of the MER board, held on October 29, 2015, November 16, 2015, and January 26, 2015.[87] The duration of these meetings ranged from 19 to 35 minutes.[88] Other board members who attended these board meetings, as well as the Restructuring Committee meetings, were paid fees. Post-petition, Mr. Gower received a total of $14,125, Mr. Hannahs received $14,750, and Mr. Sherman received $14,875.[89] Boruff was not compensated for participating in these post-petition meetings.[90] Giesler testified that, in his opinion, Boruff should have been paid as a director for attending these meetings because, at that point, he was essentially being treated only as a director.[91] He no longer had health insurance through MER, nor did he have an email account or business cell phone through MER.[92]

Boruff contends he is entitled to recover $252,657.53, which is the pro-rated amount of salary he would have received under his employment contract post-petition through the date of

---

[85] *Id.* at 102:15-20.

[86] MER Ex. 25 (Oral Deposition of Carl F. Giesler, Jr.), at 102:21-23.

[87] MER Exs. 12, 13, and 14.

[88] *Id.*

[89] *See* Ex. A to the Reorganized Debtors' Post-Hearing Brief, ECF No. 1431-1.

[90] ECF No. 1427 at 121:12-25.

[91] MER Ex. 25 (Oral Deposition of Carl F. Giesler, Jr.), at 110:9-17.

[92] *Id.* at 109:16-110:17.

plan confirmation, as an administrative expense.[93]  He argues that he performed his duties as executive chairman post-petition and that such duties gave benefit to the bankruptcy estate.  He further asserts that the terms of his employment contract alone establish the amount of his claim, without need for further analysis.  MER objects to allowance of this claim.[94]  It contends Boruff has offered no evidence that his post-petition services directly and substantially benefitted the estate.  MER further argues that the contract rate of salary in Boruff's rejected employment agreement is not determinative in establishing the amount of any administrative claim to which Boruff may be entitled.

## Analysis

Boruff has established that he is due $252,657.53 under his employment contract with MER for four post-petition months' salary that remain unpaid.  MER does not deny the salary is owed to Boruff but contends that because it rejected Boruff's employment contract the post-petition salary is part of his general, unsecured claim entitled to pro-rata distribution with the other allowed unsecured claims.[95]  Boruff argues that his post-petition salary is entitled to priority as an administrative expense which must be paid in full under the confirmed plan.

Section 503(b)(1)(A) defines administrative expenses to include, "the actual, necessary costs and expenses of preserving the estate including...wages, salaries, and commissions for services rendered after the commencement of the case."[96]  As the Ninth Circuit has noted, this "statute is explicit.  Any claim for administrative expenses and costs must be the actual and

---

[93] ECF No. 491 at 4; *see also* ECF No. 621.

[94] ECF No. 615.

[95] 11 U.S.C. § 365(g)(1).  Boruff has filed a separate proof of claim in the total amount of $1,603,732.31 for amounts owing due to the rejection of the employment contract.  MER has filed a separate objection to the proof of claim which will be addressed separately.  *See* ECF No. 747.

[96] 11 U.S.C. § 503(b)(1)(A)(i).

necessary costs of preserving the estate for the benefit of its creditors."[97]  Courts construe the statute narrowly so that administrative expenses of an estate are kept to a minimum.[98]  To qualify as an administrative expense, the debt must arise from a transaction with the debtor in possession.[99]  Moreover, the transaction must confer an actual benefit to the estate,[100] which is both direct and substantial.[101]  A "mere potential benefit to the estate does not satisfy this requirement."[102]  For this reason, an award of administrative expense is limited to the fair and reasonable value of the benefit to the estate.[103]

Boruff, as the party seeking administrative priority, bears the burden of proving his claim by a preponderance of the evidence.[104]  "Proof by the preponderance of evidence means that it is sufficient to persuade the finder of fact that the proposition is more likely true than not."[105]  Where, as here, the claimant is an insider, courts are required to examine the claim with

---

[97] *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988), *superceded by statute on other grounds*, 11 U.S.C. § 365(d)(3).

[98] *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995)*; see also In re Dant & Russell, Inc.*, 853 F.2d at 706.

[99] *In re DAK Indus., Inc.*, 66 F.3d at 1094.

[100] *In re Dant & Russell, Inc.*, 853 F.2d at 706.

[101] *In re DAK Indus., Inc.*, 66 F.3d at 1094.

[102] *In re Dant & Russell, Inc.*, 853 F.2d at 706 (quoting *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. 606, 611 (N.D. Ga. 1985)).

[103]  *In re Dant & Russell, Inc.*, 853 F.2d at 707.

[104] *Siller v. Big Hill Logging and Road Bldg. Co. (In re CWS Enters., Inc.)*, 2015 WL 3651541, at *4 (B.A.P. 9th Cir. June 12, 2015)(citing *Gull Indus. v. John Mitchell, Inc. (In re Hanna)*, 168 B.R. 386, 388 (B.A.P. 9th Cir. 1994)); *see also In re DAK Indus., Inc.*, 66 F.3d at 1094.

[105] *United States v. Arnold and Baker Farms (In re Arnold and Baker Farms)*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994), *aff'd* 85 F.3d 1415 (9th Cir.1996); *see also Kelley v. Locke ( In re Kelley)*, 300 B.R. 11, 17 (B.A.P. 9th Cir. 2003)(citing *In re Arnold and Baker*, 177 B.R. at 654); *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 761 (Bankr. D. Nev. 1998)(same).

additional scrutiny.[106]  The bankruptcy court has broad discretion in determining the allowance and amount of an administrative claim.[107]

Section 503(b)(1)(A) expressly includes post-petition wages and salary as actual and necessary costs of the estate.  Given the plain language of the statute, therefore, Boruff's post-petition salary constitutes an actual and necessary expense of the bankruptcy estate for purposes of establishing an administrative expense.  The more problematic question concerns the fairness and reasonableness of the claim.

Boruff contends he has met his burden of proving the reasonable value of his services simply by virtue of his employment contract.  He maintains that his employment contract presumptively establishes the reasonable value of his services.  Courts have long looked to contracts as evidence of reasonable value for purposes of determining administrative expenses.[108]  While often phrased as a presumption, the ultimate fact to be determined remains the reasonable value of the actual and necessary benefit to the estate.  To overcome any presumption, the resisting party must "present evidence tending to rebut the claim - evidence with probative force equal to that of the creditor's proof of claim."[109]  If the party challenging the presumption

---

[106]  *In re ID Liquidation One, LLC,* 503 B.R. 392, 400 (Bankr. D. Del. 2013); *Shin v. Altman (In re Desert Springs Fin., LLC),* 2017 WL 1434403, at *6 (B.A.P. 9th Cir. Apr. 20, 2017)(discussing requirement of additional scrutiny for insider claims).

[107]  *In re Dant & Russell, Inc.*, 853 F.2d at 707;  *see also In re DAK Indus.*, 66 F.3d at 1094.

[108]  *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984); *Thompson v. IFG Leasing Co.*, 788 F.2d 560, 563 (9th Cir. 1986)("The rent reserved in the lease is presumptive evidence of fair and reasonable value, but the presumption may be rebutted by demonstrating that the reasonable worth of the lease differs from the contract rate." (Internal citations omitted))

[109]  *Shin v. Altman (In re Desert Springs Financial LLC,)* 2017 WL 1434403 (B.A.P. 9th Cir. April 20, 2017)(citing *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000)).

16

presents such evidence, "the ultimate burden of persuasion remains at all times upon the claimant."[110]

Boruff asserts his situation is substantially similar to that of the administrative claimant in *In re Bryant Universal Roofing, Inc.*[111]  That case also involved a debtor's former chairman of the board, Mullis, who continued to serve on the board and perform various other functions post-petition.  Mullis attended board meetings for three months post-petition, and also helped sell some of the debtor's assets to certain of his industry contacts.  He asserted an administrative expense claim under § 503(b)(1)(A) based on the contractual rate specified in his employment contract, $28,028.94 per month, or $365,000 annually.[112]  Mullis was actually compensated at this rate before the bankruptcy was filed.[113]  As in this instance, the court found that Mullis was entitled to compensation on an administrative basis, because he did render services post-petition and remained on the board.[114]  But, this did not end the bankruptcy court's analysis.  The court explained; "The precise question presented is whether [Mullis] should be allowed a claim based on the Contract or upon the basis of 'quantum meruit.'"[115]  The court applied the rule set forth by the Supreme Court announced in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984):

> If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending [a] decision[] to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, . . .

---

[110]  *Id.* (quoting *Lundell,* 223 F.3d at 1039).

[111]  218 B.R. 948 (Bankr. D. Ariz. 1998).

[112]  *Id.* at 954.

[113]  *Id.* at 956.

[114]  *Id.* at 955.

[115]  *Id.* at 955.

which, depending on the circumstances of a particular contract,
may be what is specified in the contract.[116]

The *Mullis* court opted to use the salary set by the prepetition employment contract rate as a
"persuasive but not binding guide to a determination of the appropriate amount of [his] claim."[117]
The bankruptcy court did not blindly accept the employment contract as dispositive of the
reasonable value of the  chairman's salary, but set the matter on for an evidentiary hearing to
liquidate the amount of the claim.[118]

MER asserts this case presents a situation more similar to the one found in *In re Health
Diagnostic Laboratory, Inc.*[119]  In that case, the debtor's CEO and a chief scientific officer, who
were also board members, filed administrative expense claims in excess of $1,000,000.[120]  These
officers continued to serve as board members post-petition through the effective date of the
chapter 11 plan.[121]  The CEO also continued to serve in this position until a sales transaction with
the debtor's successor had concluded, at which time he resigned this position.[122]   The
employment contracts for both officers were rejected on plan confirmation.[123]   The officers
sought allowance of administrative claims under § 503(b)(1)(A) and other subsections of that
statute, based on the terms of their employment contracts.  The court noted that, generally, "[t]he

---

[116] *In re Bryant Univ. Roofing*, 218 B.R. at 956 (quoting *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984)).

[117] *In re Bryant Univ. Roofing*, 218 B.R. at 956.

[118] *Id.*  The court indicated that Mullis' administrative claim would be allowed in a range of between $24,785 and $68,194.  The lower range was based on what Mullis had actually been paid prepetition, and the higher rate was based on his contractual rate of salary.  *Id.*, n.5.

[119] 557 B.R. 885 (Bankr. E.D. Va. 2016).

[120] *Id.* at 890-891.

[121] *Id.* at 892.

[122] *Id.*

[123] *Id.* at 894.

18

counterparty to a rejected contract is entitled to assert a general unsecured claim on account of any damages occasioned thereby."[124]   The contract rates, however, would not be used to determine the amount of the officers' administrative claims.  Instead, the officers were required to prove that "the postpetition services they rendered were an actual and necessary cost of preserving the estate," and if they made this showing, they would be entitled to "the reasonable value of those services as an expense of administration."[125]   Because the determination of whether such services were beneficial to the estate was a disputed question of fact the court denied summary judgment and set the matter for further hearing.[126]

Both *Bryant Roofing* and *Health Diagnostic Laboratory* stand for the unremarkable proposition that determination of the reasonable value of an executive's post-petition services to the estate for purposes of establishing an administrative expense claim remains a question of fact.   Both *Bryant Roofing* and *Health Diagnostic Laboratory* establish that calculation of an administrative expense claim based on a rejected employment contract requires a comprehensive evaluation of the post-petition services provided by the claimant within the context of establishing a reasonable value for the services actually performed, where the contract remains a persuasive starting point.

Turning to the facts presented, Boruff seeks to use his pre-petition employment contract as the basis for his administrative expense claim.  Boruff served as CEO of MER from 2008 until 2014 when he resigned to become executive chairman.   While it is unclear exactly what the change from CEO to executive chairman meant substantively, Boruff's compensation remained the same.   No evidence was presented to explain or justify compensation of the executive

---

[124] *Id.*

[125] *Id.* at 901.

[126] *Id.* at 900.

19

chairman at the same salary he received as CEO - and only $5,000 less than what was being paid to the incoming CEO.

Approximately one year later, MER filed for bankruptcy.  As executive chairman of MER, Boruff appears to have had no administrative, managerial, or operational responsibilities, either pre-petition or while in bankruptcy.  Rather, he was responsible for future development.  Upon filing its bankruptcy, MER had already authorized a plan term sheet with the Lenders detailing the terms under which the Lenders would purchase the Debtor.[127]  The term sheet served as the basis for the Debtors' confirmed joint plan of reorganization.  As of the bankruptcy filing, MER had no future development.

Boruff argues that after the bankruptcy filing he continued the same work he had undertaken pre-petition.  He testified that he worked "day in, day out trying to get somebody to buy [MER] assets."  Yet, it is unclear how much time Boruff actually spent on such efforts post-petition.  The court accepts that Boruff spent more time than the roughly 3.5 hours reflected in MER Exhibit 23.  However, there was no other evidence to establish how much time he actually spent on the post-petition efforts to find new financing or a buyer for MER or its assets.  The court finds Boruff's statement that he worked "day in, day out" on such efforts to be neither credible nor helpful.

Although the court is troubled by the inability to ascertain exactly what work Boruff provided post-petition, it is left with the firm conviction such services did not provide $252,657.53 in reasonable value to the estate.  Rather, the court concludes that MER has rebutted any presumption that the pre-petition employment contract states the reasonable value of Boruff's post-petition services.  Boruff argues that his efforts to find financing or a new buyer justify payment of his post-petition salary.  Even prior to MER's bankruptcy filing, the company had charged SGS with finding new financing or a buyer.  This was a material development as

---

[127] Decl. Of Carl R. Giesler, Jr., Chief Executive Officer of Miller Energy Resources, Inc., et al., in Support of Chapter 11 Petitions and First Day Motions (ECF No. 61) at 24-26.

MER excluded Boruff from the Restructuring Committee created upon the bankruptcy filing. He was excluded from the committee for the first month of the bankruptcy, further evidencing that MER did not require Boruff to locate financing or a new buyer. Although Boruff joined the Restructuring Committee in November 2015, by this time he was aware that MER was no longer paying his salary. More importantly, the prospective buyers Boruff says he dealt with post-petition were already known to MER and SGS. The weekly reports prepared by SGS indicated that it, rather than Boruff, was the one having detailed and significant discussions with these prospective purchasers.

Despite these efforts, even SGS was unable to procure a post-petition offer. This is not to suggest that either Boruff or SGS had to bring binding offers to the table to receive an administrative expense claim. But, the failure to procure a binding post-petition offer further exacerbates the court's inability to determine what Boruff did post-petition or evaluate the reasonable value of such services. Instead, the only evidence presented establishes that he spent minimal time duplicating the investment banker's attempts to procure bids that were never forthcoming from the same potential suitors that refused to enter into purchase agreements pre-petition.

The court does not agree with MER that Boruff's post-petition efforts to find a buyer provided no benefit to the estate. MER maintains that it did not ask, or expect, Boruff to continue to seek potential purchasers post-petition, but it never terminated his services or even directly instructed him to cease his efforts. MER effectively sidelined Boruff by retaining SGS and excluding him from the Restructuring Committee. Yet, MER continued to employ Boruff as its executive chairman post-petition. Those services provided some value to the estate. MER cannot complain that Boruff attempted to do his job as he saw it and without instruction.

The problem remains, however, that while those services provided some actual benefit to the estate, Boruff's salary has no relation to that benefit, and Boruff has not provided the court with any other evidence to define or value his post-petition services. MER has presented

Giesler's testimony that post-petition the company treated Boruff as a director rather than an active member of management. Such a view aligns with the reality of Boruff's relationship with MER post-petition which centered upon his participation in the board of directors meetings and ultimately the Restructuring Committee meetings. Although Boruff asks the court to credit and value his communications with potential purchasers and investors, such services were never detailed or valued sufficiently for the court to determine any reasonable value. The evidence demonstrates that three other directors attending similar post-petition meetings were compensated between $14,000 - $15,000. The court will award Boruff $15,000 for his post-petition services as a director of MER.

## Conclusion

Boruff seeks allowance of an administrative expense claim, under § 503(b)(1)(A), in the sum of $252,657.53, for postpetition services he provided to MER. He calculated this claim by simply prorating his contractual annual salary rate of $795,000 from the date the petition was filed to the date of plan confirmation, a period of roughly four months. The court finds that MER has rebutted any presumption that the contract establishes the reasonable value of Boruff's post-petition services. Boruff has failed to establish that the services he provided post-petition had a reasonable value of $252,657.53. His efforts to find potential buyers for MER's assets were ill-defined, not productive, and duplicated those of SGS, who had been retained by MER to perform the same function, but on a much broader scale. Boruff will be awarded an

administrative expense claim of $15,000.00 for his post-petition services as a member of MER's board of directors and its Restructuring Committee.

DATED:   September 13, 2017.

BY THE COURT

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

22

Serve: C. Carollo, Esq.
      A. Guerrero, Esq.
      B. Sullivan, Esq.
      P. Paslay, Esq.
      D. Zdunkewicz, Esq.
      ECF Participants per NEF